Good morning, ladies and gentlemen. This is the time for a re-hearing on Bank in the case of Doe v. Kamehameha Schools. I understand that we have Judge William Fletcher with us by phone. Yes, I'm here, Judge Schroeder. Thank you. Good. Thank you. We all understand that – also understand that those who intend to put an argument are ready and prepared, and so the appellant may proceed. Good morning. Eric Grant, plaintiff appellant, John Doe. Chief Judge Schroeder, and may it please the Court. This Court is faced with a stark choice. Give the imprimatur of the federal courts to a racially segregated school, or instead, enforce the nation's oldest civil rights law. The choice is obvious. The facts and the law compel the conclusion that defendants' racially exclusionary admissions policy is, in a word, illegal. A central fact in this case is that defendants operate an admissions policy that stands as an absolute bar to children of non-preferred races, a policy under which children of the wrong bloodline, like plaintiff here, are foreclosed from all consideration for every place at Kamehameha Schools. The central point of law in this case is that such a policy fails any level of scrutiny, and it is to that level of scrutiny that I would like to turn first. The Supreme Court has told us what that is. Three years ago, in Gratz v. Bollinger, the Court said, and I quote, purposeful discrimination that violates the equal protection clause of the 14th Amendment. Well, we're not. Also violates section 1981. We're not in protection land here, are we? No, Your Honor. This is a statutory claim under 42 U.S.C. section 1981, as was the case in Gratz. The plaintiffs there brought a claim not only under the 14th Amendment, but also under Title VI and section 1981. And the Supreme Court, having resolved the 14th Amendment claim in the plaintiff's favor, went on to say the language that I quoted, saying that the plaintiffs had established liability under section 1981 precisely because they had proven a violation of the equal protection clause. Counsel, even if we find that a Title VII standard applies, can you still win? Certainly, Your Honor. As I said — That's another way of saying, to what extent is the standard relevant to the ultimate question? Your Honor, the policy of Kamehameha schools to exclude categorically children of lacking Hawaiian ancestry fails under any level of scrutiny, including Title VII scrutiny. The policy stands as an absolute bar. And this Court, interpreting the Supreme Court's decisions in Weber and Johnson in the case of Radovash v. Hughes, said that that fact, a policy that stands as an absolute bar to persons of the nonpreferred race, violates Title VII. Why is the choice, or is the choice exactly between Title VII and strict scrutiny, or is it between strict scrutiny and a 1981 standard which takes into account that we're talking about private discrimination and they draw on the Title VII cases but isn't necessarily precisely the Title VII standard when we're not dealing with employment? Your Honor, we submit that the standard is strict scrutiny as applied in the equal protection context as applied also in a — But if it were, if it were something else, why would it be Title VII exactly as opposed to something that — a standard that takes into account the precise statute we have in mind, the precise circumstances, private discrimination, the precise kind of discrimination and so on, the educational context and so on? Your Honor — Why are we bound to one or the other? The Supreme Court has interpreted Section 1981 to apply to both public and private conduct. The Court has interpreted Section 1981 to apply to numerous contexts, including employment, including education, as here. Of course, the seminal case is Runyon v. McCrary, where the Court said that a private commercially operated school, like Kamehameha Schools, is subject to the standards of Section 1981. So — What if it didn't charge tuition? Your Honor, that, of course, would be a different case. Section 1981 covers the — Clearly, that's why I said, what if? The statute covers the making and enforcement of contracts. In Patterson v. McClain Credit Union, the Supreme Court cut back on its previous interpretation of what a contract — Answer to my question. Your Honor, the answer is I don't know. We know that Kamehameha does charge tuition, and Kamehameha has never contested in this case. You don't know until you don't want to hazard a guess. I mean, most of the — a lot of the kids get — 65 percent of the kids get assistance, basically means they don't pay the full tuition or hardly anything. It's understanded most of the — tuition doesn't cover most of the cost of education, which is sort of a drop in the bucket. So I'm just sort of wondering what happens if tomorrow they say, okay, we're going to run exactly the same programs we do today, but we're just not going to charge tuition to anybody. Same standards, same — same everything, except those people who are lucky enough to be admitted pay nothing. The Federal courts have had experience with institutions that have been found to violate the Constitution or the civil rights laws, who change their policies in a manner that on its face appears to be neutral, but in fact is a subterfuge for continued — You think that secretly they're sort of passing money under the table? I'm asking you to assume that doesn't happen, that in fact they just say, look, we're just not going to charge tuition. I'm just wondering, if you don't have an answer, it's not our case, as you said, if you don't care to hazard a guess, that's okay, too. I was just wondering if you had a view on this. Your Honor, I don't have an answer except — I'm asking the same question. Except this, that — that the regular rules would apply. Section 1981, as — Well, of course. They're not special rules. I'm just wondering how the regular rules would apply. If it were not a contract — if it were not — if it did not involve the making and enforcement of a contract, Section 1981 would not govern that situation. Counsel, is — this is not — this is not a for-profit operation, is it, the Kamehameha School? It is a charitable institution, Your Honor. See, because this is — I think the Chief Judge may have the same question I have. You refer to Ronyon as a commercial enterprise, which is what got me to thinking about it. Whereas this is clearly not a commercial enterprise. And I'm just sort of wondering why you are in 1981, within the sweep of 1981. I mean, let's say somebody leaves a trust and says — or chooses to make a gift and says, you know, I'm going to make gifts to charity, and I choose to make gifts only to, you know, Chinese. People of Chinese descent, because, let's say, I'm — you know, the donor happens to be Chinese and wants to make, you know, benefit his community. There's nothing wrong — 1981 doesn't cover that, does it? Probably not, Your Honor, because it is not a contract. What is the contract here? The contract is the exchange of tuition for educational services. Does it matter in your application of 1981, regardless of the standard that applies, does it matter that the policy of the school is intended to exist only so long as there is a demonstrable problem in the educational levels of the Hawaiian children? I haven't stated it precisely as the policy has, but the point is it is not a requirement policy as it is stated. Your Honor, what the defendants themselves have said is that the singular admission of a non-Hawaiian in the academic year 2002 was, quote, an unusual situation that is unlikely to recur. I think I may not have made my question clear prospectively. Someday in the future, it may be that Native Hawaiian children do not have some of the disadvantages that Congress has recognized now. Does that matter to the legitimacy of the policy that it is keyed to achieving some sort of parity in the future? No, it does not, Your Honor, because what this Court's cases following the Supreme Court's lead have said is that remedial action under Title VII is valid only if it is designed to attain a balance or, to say the same thing, to eliminate an imbalance within the employer's workforce or, by analogy, within the student body. And there is no imbalance against Native Hawaiians at Kamehameha schools, given that the preference for Hawaiians has been in existence for 120 years. But, counsel, isn't the contract, aren't the contracts that you refer to here, that is, with I guess the arrangement between the students and the school, isn't that all being done pursuant to the terms of a testamentary trust? Your Honor, the terms of the will have or are the subject of great debate. What is clear is that from the very beginning, the trustees have implemented a policy that excludes persons lacking Hawaiian ancestry and Well, whether rightly or wrongly, they were acting in accordance with, I mean, whether correctly or incorrectly, they were acting in accordance with what they perceived to be the purposes of the trust or weren't they or not? Irrelevant. Perhaps, but I believe it is irrelevant because federal civil rights law looks at, not at the origin, but what is occurring right now. But you're looking in the employment context, and I'm trying to look more into the trust context of a trust for who wishes to benefit a disadvantaged group. Your Honor, I think the analogy here is perhaps the Girard College case from Pennsylvania that the Supreme Court, the Third Circuit and the Supreme Court decided in the late 1950s and early 1960s. Again, this was a bequest from a private individual to educate essentially young white men. And the Supreme Court, the courts, the federal courts said the origin of the funds did not matter. What was important was to apply the constitutional and statutory principles in existence at the time the policy was challenged. Can I suppose the ---- I wonder if we need to get past 1981, Runyon and McDonald. Do we need to get any further down the road than that into Title VII or constitutional principles, or is this case simply analogous to Runyon? I believe it is analogous to Runyon, Your Honor. And I think it's important to note that Kamehameha has not challenged the applicability of Section 1981 to its admissions policy. It has not denied that there is a prima facie violation of the statute. But how can you stop with Runyon in light of Weber? Well, Your Honor, I think what the Supreme Court's subsequent case law has confirmed, whether under strict scrutiny, whether under Title VII scrutiny, if there is an absolute bar, the policy is illegal. As this Court said in Gilligan v. Department of Labor ---- Was it an absolute bar in the air, or is it an absolute bar with reference to the articulated purpose and its legitimacy? Well, it was certainly an absolute ---- Somewhat differently. Here the purpose, articulated purpose, is to redress an educational imbalance for people of Native Hawaiian ancestry. Your Honor, perhaps it's ---- one might say that the bar goes to the means by which the policy is implemented, and it is implemented in a categorical fashion. Well, I mean, the policy as such, it's hard to ---- I suppose it could be implemented in a non-categorical ---- in a non-categorical way. But it is to educate Native Hawaiians until such time as they're all got educational opportunity. And that's why it's illegal, because this ---- for instance, this Court in the Gilligan case said if a place is unavailable because of a prescribed factor, in that case it was sex, that policy is illegal. And a place at Kamehameha Schools was unavailable to Plaintiff John Doe precisely because of his race, because, of course, the defendants admitted that had John Doe been Native Hawaiian, he likely would have been admitted in that context, of course, likely being more likely than not. So for him, race was decisive. May I interrupt? This is Judge Fletcher asking a question. What if Congress were to pass a new statute characterized as, I don't know, the number would be 1981 and a half, and the new statute is worded roughly as follows. Congress says, we recognize children of Hawaiian ancestry as a political class, and we hereby explicitly accept such children from what otherwise might be thought to be the coverage of 1981, such that a private school may restrict its admission to children of Hawaiian ancestry. Would that statute be constitutional? Your Honor, as the panel majority referenced, there are perhaps some troubling constitutional questions with Congress exempting a certain category of persons on the basis of race from the coverage of rights. Well, I specifically did not say on the basis of race. I said on the basis of children of Hawaiian ancestry being a political category, and, of course, I intend to bring into that question, then, the various statutes Congress has already passed recognizing those with Hawaiian ancestry as a political category, as well as, by analogy, the various statutes that Congress has passed recognizing Indians and Native Alaskans as a political category. Your Honor, I think what your hypothetical statute illustrates is the very distinct difference between a clear and manifest amendment to Section 1981. Well, it may, in fact, be a clear and manifest exception, but I'm asking you whether, in your view, that statute would be constitutional. Your Honor, I don't have a definitive answer to that question. And why not? Because it's not a live issue. Congress has not come anywhere close to … Well, it may well be a live issue. I've made it explicit, but the argument is that it's implicit. So I've just made an implicit question explicit, and I'd like your answer if you have one. Your Honor, again, with respect, my answer is I do not know. That would raise some troubling issues. But what I do know is that Congress has not done anything remotely similar in this situation. In all the years of litigation in this case, Kamehameha has never been able to point to any particular provision of the United States Code that would require it to operate a racially segregated school. I'm not talking about required, and I'm not talking racially segregated. I'm talking about permitted, and I'm talking about political category. Well, Your Honor, certainly the Supreme Court's decision in Rice v. Cayetano has said that as the law stands now, the category of Native Hawaiian is a racial category for purposes of the Constitution and … No, for the purposes of the 15th Amendment and voting rights. No, Your Honor. With respect, the Court was very clear that that determination applied also to the civil rights laws. In fact, the Rice Court cited the St. Francis College case that was a Section 1981 case. And what the Court said is that Congress has not even begun to take those steps that would be necessary to translate the category of Native Hawaiian into a political category. Yeah, but what would happen if Senator Akaka's bill were to pass? What effect would that have on this case? On this case, Your Honor, I believe none, because as it stands now, plaintiff's sole remedy is for money damages for wholly passed violations of Section 1981 for the past four academic years. So … You don't represent anyone other than John Doe. I do not, Your Honor. This is not a class action. Is the prospective release that you requested now moot? I believe it is, Your Honor. Okay. So all you're seeking now at this point is monetary damages. Yes. Is it correct that, as far as we're concerned, John Doe could be white, black, Chinese, Filipino, Japanese, any ethnic descent at all, Alaska Native, anything? Your Honor, I believe the complaint alleges that John Doe is Caucasian, but the important point is that Kamehameha's … Does it matter legally? No, it does not. Kamehameha's policy excludes all of the individuals whom you named. So in your view, of what significance is the unique historical relationship between this country and the Hawaiian Islands? Your Honor, we submit that that is legally irrelevant. What Justice Stevens in dissent in Rice v. Cayetano chastised the majority for ignoring the, quote, unique history of Hawaii. But that is precisely what the court did. It said that that history simply does not matter for purposes of coverage of the federal civil rights laws. And I think what that question brings up the larger issue of whether the regular rules, whether they're constitutional, whether it's strict scrutiny, whether it's Title VII scrutiny, whether the regular rules apply in Hawaii and apply to Native Hawaiians. Counsel, there's a body of regular rules under Morton v. Montgomery that's special for Indians in certain circumstances. And there's a federal definition of Indians at 25 U.S.C. Section 479. It's some but not all persons of American aboriginal descent. Hawaiians are of American aboriginal descent, but they're not in that definition of Indians. If they were in that definition of Indians, would we then be looking at Morton v. Montgomery law, and is it decisive that they're not in 479 for purposes of not applying Morton v. Montgomery law? I think it is decisive, Your Honor. And I think that's precisely what the Supreme Court held in Rice v. Cayetano. A Morton v. Montgomery argument was advanced in that case on behalf of the state of Hawaii and the racial preference there. And the Supreme Court rejected it and said that Congress had not even begun to take the steps necessary to do that application. I also think that this Court's decision in Dalla Vendewa in 1998 provides a good example of that. In that case, this Court held that the general mandate against private discrimination, it was a Title VII case, includes or encompasses discrimination against or in favor of American Indians, notwithstanding that there are specific statutory preferences for certain categories of conduct. If I could get back to Master Doe for just a minute. How do we know if he'd have gotten in if he had been of the right ethnic background? The defendants admitted it, Your Honor, at paragraph 16 of their answer on page 68 of the excerpts of record. What did they say? They said it is likely that he would have been admitted if he were Native Hawaiian. So for him, the fact that he lacked Hawaiian ancestry was a decisive consideration. It was precisely the opposite of individualized consideration. What are his damages? You said that the only relief you are now seeking is damages individually on behalf of John Doe. What are those damages? I guess what I'm getting at is, is this case moot entirely? Your Honor, it is categorically not moot. The complaint sought the relief of money damages. My client continues to seek that relief. How do you measure the damages? Your Honor, that's a difficult question. The posture of this case is such that we did no discovery. Neither side has hired any experts, so we simply have not explored that. Did you cross-move for summary judgment? Did you move for summary judgment? I did, Your Honor, on plaintiff's behalf. And you didn't offer any evidence of damages? No. I moved for partial summary judgment on the legality of the admissions policy and injunctive relief. I wanted to get my client into the school as soon as possible. Counsel, can I take you back to the Girard College case? That was a will which limited the education to white students. Suppose the will provided instead that it was limited only to descendants of slaves. How do you suppose the Supreme Court would have decided that case? Your Honor, if intent, in looking at the intent, is to limit it to persons of one race, I think the Supreme Court would say that that violated the civil rights statutes. And I think the McDonald case decided on the same day as Runyon v. McCrary is a good example of that. There was the argument that Section 1981 was intended to apply only to non-whites. And the Supreme Court very clearly rejected that argument and said the protections of that oldest civil rights statute apply to discrimination against or in favor of any race. Did Girard College accept any public funds of any kind? Your Honor, I believe there the court ruled that the operation of the city of Philadelphia had introduced a public action element. Is that different in this case where the schools take no public money, all the money that operates the schools is entirely private? This returns to Chief Judge Schroeder's question. This is all derivative of the monies that were in possession of the Hawaiian monarchy left by the will? It is different in the sense that that was a 14th Amendment case and this is not. What is the same is that the origin of the funds was held not to be a reason for not applying the regular rules. But there's no state action here. There is no state action here. And if there are no further questions, I would like to resume. Could I have one further question? Since Rice v. Cayetano, didn't Congress make it perfectly clear in its findings in the Native Hawaiian Education Act that this is a matter of a political character rather than a question of race? And didn't they say that specifically in connection with the educational problems in Hawaii? No, I do not believe that Congress did, Your Honor. It has not acted in the clear and manifest terms that the Supreme Court's precedents require. And I think that this Court's cases and a name that I'll mangle that begins with a K versus Norton decided just a couple of years ago recognizes that for purposes of the civil rights laws, Native Hawaiian is and remains a racial category. But whatever we said, Congress made a specific finding that at least what the federal government does with respect to Native Hawaiians is not because of their race but because of their unique status as an indigenous people of a once sovereign nation. And doesn't that answer some of the questions as to what's going on in this case? Like the federal government, the school treats Native Hawaiians not as a race but as a group of indigenous people with a unique status under federal law? Your Honor, again, with respect, I would say that Congress has not acted in a way that would even begin to overrule the Court's decision in Rice v. Cayetano. Doesn't the fact that Congress is trying to pass something right now support your position? Well, I think certainly it's indicative, Your Honor, that if the need for the so-called Akaka Bill, if Congress had already done this, perhaps there would not even be a need for the Akaka Bill. Couldn't it just be a clarification of what's already been implied, though? Perhaps, Your Honor, but I think, again, that this Court's cases, recent cases post-Rice and post-2002, continue to confirm that Congress has not taken those steps, has not gone down the road, the long road, that the Supreme Court said would be necessary to bring Native Hawaiians into the same category as sovereign tribes of American Indians. Thank you. We'll give you a couple minutes for rebuttal. Good morning. Kathleen Sullivan for Kamehameha Schools. Chief Judge Schroeder, and may it please the Court. The issue in this case is not, as plaintiff's counsel has stated it, it is whether the nation's oldest civil rights law, passed by the same Congress that created the Freedmen's Bureau bills to lift up the newly freed slaves, bars to marry in schools, the nation's oldest and most successful private educational remedial institution for the education of Native Hawaiians, from doing the same for an indigenous people. It does not. And the standard of review to begin with that is deferential rational basis review. We are not, as Judge Kaczynski correctly said. So what are we reviewing? We're reviewing the practice of a private institution under 1981. So our deference is to the school itself and its racial policy. Not deference to the school itself, Your Honor. Deference to Congress. The only issue in this case is how to interpret a congressional ban on race discrimination embodied in 42 U.S.C. 1981. To do that — Where is the rational basis review? Rational basis review comes from this Court's interpretation of 1981. So Johnson, the Johnson decision in 1984, picking up the standard of review from the Setzer decision, the Eighth Circuit decision, says that the issue in a 1981 case is whether a remedial race preference is addressing a legitimate non-discriminatory purpose, in this case a remedial purpose, is reasonably related to that purpose, and does not unreasonably exceed that remedial purpose. Counsel, then you are conceding that we are dealing with a racial preference? Not at all, Your Honor. The most important feature of this case is — But I must say, I don't think I understand your prior sentence. Your Honor, the issue in this case is whether 1981 bars a private institution from providing remedial education, remedial education preference for an indigenous people. Now, an indigenous people, Native Hawaiians included, are a group that, because of their history of conquest and overthrow, have both a racial aspect and a political aspect. But hasn't that been pretty well determined for us? Aren't we bound by the findings or the holdings in Rice v. Cayetano by the Supreme Court of the United States? Judge O'Scanlan, Rice v. Cayetano did not speak to the issue in this case. Rice v. Cayetano held simply that a racial — sorry, a classification giving preferences to Native Hawaiians in voting in a State agency, an arm of the State, was sufficiently racial to violate the Fifteenth Amendment. And in that case, was not saved by the political status of Native Hawaiians. I think you're trying to get us — The clock is not working. If you just — I think you're trying to get us to pass the Akaka Bill after the Senate defeated it. Not at all, Your Honor. I don't really see how you make much of the argument in light of the statutory definition of Indians. Judge Feinfeld, the trust relationship, the special trust relationship between the United States and the Native Hawaiian people is of ancient origin. It dates at least back to the 1920 Hawaiian Homes Commission Act. It was reaffirmed in the 1959 Statehood Act. And it continues through the 1988, 1994, and 2002 iterations of the Native Hawaiian Education Act. And as Judge Reinhart correctly stated, even after Rice v. Cayetano, the Congress reenacted the Native Hawaiian Education Act, stating that it was providing explicit and exclusive benefits to Native Hawaiian students through loans and scholarship programs that were federally funded because, and Judge Reinhart quoted it, of their unique status as the indigenous people of a once-sovereign nation as to whom the U.S. has established a trust relationship. That's 20 U.S.C. 751212b. And as Judge Fletcher asked earlier, would it be constitutional for Congress to enact a version of the Akaka Bill and to state that Native Hawaiians are not just comparable to, as it's already stated, not just comparable to Native Americans and Alaska Natives, but identical to, no different from any other tribe? Kennedy. Could we do it if Congress said no? Suppose Congress passed a bill amending 25 U.S.C. 479 to say Native Hawaiians are not Indians. Could we say they are? Kagan. No. It's up to Congress and Native peoples themselves to define. But this preference would still be permissible under 1981, even if there was no Native Hawaiian statute on the books. And let me be clear. We're back to Judge Kaczynski's point about standard of review. We are not an equal protection land. This is not a public entity. This is not a school that accepts anything from the public fisc. We're not in the world of strict review or narrow tailoring. We are quite differently in the standard of review applicable to private review purposes. I don't see that we're in the standard of any standard of review issue at all, because you don't defer to private institutions under Runyon. Now, if they did not charge, that would allow for a distinction from Runyon, because Runyon pointed out that it was an exchange of money for services. Judge Kleinfeld, as Judge Reimer correctly pointed out before with respect, we do indeed defer to the actions of private institutions. Congress has enacted a policy under the Civil Rights Acts of banning discrimination. So if Native Hawaiians were discriminated against, of course they could invoke 42 U.S.C. 1981 to say that that was a violation of their right against race discrimination. But the policy of the United States Congress since Weber, as interpreted by the U.S. Supreme Court, has been to encourage private remediation of past oppression. And in my opinion the problem I have with the remedial theory is so many people in Hawaii are deserving of it, Filipinos, people that were brought over as near slaves on pineapple plantations from China, Japan, all sorts of people in Hawaii, and not just Native Hawaiians. So unless Congress takes the action, I don't know what we can do. Well, Judge Kleinfeld, the question here is, is the policy reasonably related to remedying past harm? There's no dispute in this overwhelming and undisputed record that the harm and devastation to Native Hawaiians has been unique. Hawaiians, unlike Filipinos or any other immigrants to the islands, because, Your Honor, if you have a private entity and they decide to remedy some part of the discrimination, they don't care about the Filipinos or Americans, this is the Hawaiian monarchy and that's what they care about. If this were the government, it might be one thing, but it's not the government. It's a private entity that has chosen what piece of bad things in the world to worry about. So is that different than a government? Your Honor, it is different from the government in the sense that the deference here to the private activity should be greater. It should be greater because it's private. It should be greater because, as you suggested, it's education, not employment. And it certainly should be greater because Kamehameha Schools is implementing through its own private action the exact same remedial policies that Congress itself has provided for with respect to Native Hawaiians. Congress has not passed bills for the remediation. But they're private and they have some more range of freedom of action in general under our set of rules. That's absolutely right, Your Honor. So just to be clear, why is the standard of review here so deferential? Why should 42 U.S.C. 1981 be interpreted to give Kamehameha Schools more leeway than it would have if it were a public entity, more leeway than it would have if it were serving some group other than Native Hawaiians? Kennedy, wouldn't it make a difference whether we were talking about a racial classification versus a political classification so far as deference is concerned? Judge O'Scanlan, let me go back to your example before of what if Gerard College had left the will not for the odious practice of an all-white academy, but instead for the remedial purpose, the same remedial purpose as the Freedmen's Bureau bills were enacted, to lift up the newly freed and descendants of the newly freed slaves. Under 1981 as interpreted by this Court and the Supreme Court, that might well be permissible under 1981 because it was reasonably related to remedying the ongoing harms of past discrimination against slaves. So we believe that the deference comes both from the remedial character, even if you view this as a race case, and from a political character viewed as a Native Hawaiian case. Excuse me. I'm very sympathetic to the goals of the trust here and what the Kamehameha Schools are trying to do, but the problem is I'm stuck on Rice v. Cayetano because even though that was a voting rights case, there is a specific passage in the opinion that says we reject this line of argument, namely the restriction is not a racial classification. Ancestry can be a proxy for race. It is that proxy here in specific reference to the students who are preferred at Kamehameha School. Your Honor, there's Rice did say that ancestry can be a proxy for race, but Rice also said in reversing this Court that we assume the validity of the underlying trusts without intimating any opinion on that point. That's 528 U.S. at 521.22. The point there is that Judge Justice Kennedy, writing for the Court, said that the Court was expressly reserving the question whether Native Hawaiians may receive benefits permissible under the Fourteenth Amendment. And just to return to Judge Fletcher's question, there's no question that the statute he hypothesized would be constitutional under the Fifth Amendment because of the longstanding Morton v. Moncari principle that Congress has great leeway, notwithstanding the constitutional protections of the Equal Protection Clause. May I interject? This is Judge Fletcher, and maybe I can come back in a sense to the same question that you're repeating, but in a different way. The only argument that's being made to us, as I understand it, by Mr. Doe and his argument, is that the statute forbids the preference given to children of Native Hawaiians. There is not a constitutional argument, but rather there is a statutory argument, from which I take it to mean, now my hypothesis at the moment will not be an exception to 1981, but a straightforward repeal of 1981. I suspect, in fact it seems to me quite clear that if 1981 did not exist, that Kamehameha Schools would be entitled to do exactly what it is now doing. And to go off and to draw our trust and treat this as if this were state action, and to treat this as if this were an equal protection argument without regard to whether or not this was a political category, is to take us down paths that I think we simply do not need to follow. Judge Fletcher, 1981 is just a matter of a statutory claim, and as the Supreme Court has always pointed out, we need to view the intent of Congress in 1981 in light of the background statutes, and among those background statutes is an unbroken history of congressional preferences for Native Hawaiians, stretching back to 1920 in the Hawaiian Homes Commission Act. I agree with you in so saying, and what I want to say is, while the question of statutory interpretation may be difficult, because we've got a question of applied overruling and various sorts, just as we had a question of applied overruling in the Moncari case, it's nothing more complicated than a question of statutory interpretation. Agreed completely, Judge Fletcher. It is just a question of statutory interpretation, statutory interpretation. What statute are we interpreting, the 1991 statute? Yes, we are, Your Honor. We're interpreting 42 U.S.C. 1981. As reenacted in 1991? As reenacted in 1991. In light of a lot of other congressional statutes giving special treatment to Hawaiians as indigenous people, does that include the award of educational funds for this specific purpose and limited to Hawaiian natives? Yes, it does, Judge Reinhart. The 85 statutes that are referenced at the back of the supplemental excerpts of record have given exclusive benefits to Native Hawaiians for educational purposes, singling Native Hawaiians out for these benefits, and have done so both before and after the reenactment of Section 1981 in 1991, the first Stafford-Hawkinsville version of the Native Hawaiian Education Act of 1988. Aren't we talking there just about contributions of money, for example, the way Congress frequently contributes large amounts of money to various groups in Alaska because there's congressional concern for those groups? Your Honor, there is congressional concern for Alaska Natives and for Native Americans, but the Native Hawaiians are -- They couldn't contribute money to whites or to blacks, could they? They're not. Let's return to the reason why the fact that this is an indigenous people is important. Congress issued an apology resolution in 1993 on the anniversary of the overthrow of the Hawaiian government, the illegal overthrow which Congress acknowledged. Indigenous people are different from other immigrant racial groups in that they have not only been subject to socioeconomic discrimination, not only are Native Hawaiians at the bottom of the social indicators most likely to be subject of neglect and abuse, 40 percent of Native Hawaiian men are in prison, most likely to wind up in menial jobs rather than professional jobs. Many groups can claim suffering of that kind. What makes indigenous groups quite distinct is that they have been dispossessed of sovereignty, and that's why Congress's recognition that Judge Reinhart referred to before, that these are the indigenous people of the one sovereign nation. I don't think that's correct. The doctrine in Indian law ever since Chief Justice Marshall laid it down was precisely the opposite, that they are domestic-dependent sovereigns who retain sovereignty except to the extent that Congress has destroyed it. Once you concede, and you have to because Rice says so, that the Hawaiians were dispossessed of sovereignty as opposed to the continental American Indians who retained sovereignty, you've got quite a different category. Your Honor, the 1924 Indian Citizenship Act extended citizenship to all Indians.  The Court has repeated over and over again since then that Indian tribes retained sovereignty, and Morton v. Moncari said that it was Indian self-government that justified the BIA employment preference that was constitutionally permissible in that case because of the retained sovereignty  All of these discussions involving, you know, the Native Americans and the Native Alaskans and the Native Hawaiians, all this is is a way that our country acknowledges the wrongs that our country committed in the past, and we're making amends for it. That's what it's all about, isn't it? That's correct, Judge Ferguson. Does that include anything whatsoever? I mean, let's say... I'm sorry, Your Honor, anything? I mean, I'm talking about the policy. To what extent do we look at the policy of the school? And I don't mean to suggest at all that this is what would be happening here, but let's say it turns out the school were, in fact, teaching anti-Caucasian rhetoric and policy to the students. Would that be something we take into account? I mean, if... We have an institution here that, I'm assuming we get past the basic point that this client was making, which I think he was making, that you don't get past run-in. But assuming you do get past run-in and you look at the institution itself, is anything okay under 1981 so long as we fall into one of those categories? Do we look at the policies of the school? Do we look at the question of whether or not what they are doing in the school is in any way... Yes. Well, Your Honor, the question is, is the policy of the school reasonably related to a legitimate remedial purpose, and does it not unreasonably exceed it? And so, yes, we do look at the policy of the school. Let me sharpen the question for you. You know, ever since law school for me, and you may have been in high school at the time, I mean, we had DeFouris, we had Barkey, we have recently had the cases in for Michigan. The last case I was on was the Seattle School District case, and we were told about the wonders of diversity. Yes, Your Honor. Which I think, I mean, I don't mean to be sarcastic about it. I think diversity is a wonderful thing. It's a good thing in a melting pot society. And I'm sort of wondering, I mean, this is a school that does exactly the opposite. What it does is it separates children from other children of other races and essentially puts them together. And in very much a sort of a society that's very different from what we have been saying for 30 years is the way we ought to be running our educational institutions. To what extent do we take that into account? Your Honor, some schools exist, some school admissions policies exist to increase diversity, and other schools' admissions policies may legitimately seek to remedy past harms. Like VMI? In order to – well, no, that was – in order – it's a public institution, Your Honor, and that's different. But let's go back to what the policy here is. Princess Powahi founded this school by charitable testamentary trust in 1883, as Chief Judge Schroeder referenced. She did so at the nadir of a people who had been reduced in population from 300,000 more, plus at the time of her arrival. So all of that assumes that it is a legitimate purpose for a private philanthropic organization to remedy societal wrongs rather than to remedy its own wrongs. That's exactly right, Your Honor. But what support is there for the legitimacy of a purpose to effectively take on a public role? Your Honor, first of all, Kamehameha Schools is not remedying broad societal discrimination. It's remedying the discrete harms of Western takeover leading – culminating in the overthrow. But even – But there's still not harms that Kamehameha Schools inflicted on anybody. Your Honor, the authority is, as you yourself said moments ago, is Weber. And all the cases that have been interpreted in 1981 in light of Weber – In Johnson, it was doing so. But in Weber, with respect, not. What Weber was doing was, by the Court's own admission, what the Steele Company was doing in Weber was remedying the societal discrimination, the background educational deficits that meant there were no skilled African-Americans to look to to hire. So skilled training programs are the best analogy. And to go back, Judge, it was this – It was for job categories that the company had caused to be segregated. Well, the company had had segregation, Your Honor. But it was the Jim Crow laws of the South that had kept African-Americans from gaining the skilled – skill level that would enable them to attain the jobs that Weber tried to jumpstart. And, Judge Kosinski, to go back to your question, some schools promote diversity. Some schools promote remedy in order to lead to diversity later on. I wouldn't be any different if a black philanthropist, an African-American philanthropist, set up a school for African-American students. Judge Berzon, would you please speak up? I would like to hear your question. I would also like to request that we not interrupt the lawyers at the podium because I'd like to hear their answers completed. Well, Judge Craigerson, I can restate Judge Berzon's question to Judge Kosinski. Judge Berzon asked whether a black philanthropist could create a private school for black students to remedy past harms. And, Judge Berzon, that goes back to Judge O'Scallion's question about Girard. Had Girard been race-reversed? Now, our position is that 1981 would permit a racially remedial private school education program if we were clear that it was for remedy and not for what Justice O'Connor once called a racial spoil system. Counsel, I was curious about the same thing that Judge Berzon asked about because there are, in fact, elite black colleges that have existed since Reconstruction. Yes, Your Honor. Tuskegee, Morehouse, Spelman, and a few others. I think they're actually supported mostly by the Rosenwald fortune for many years. And when I tried to find some law that would support Kamehameha School, every case seemed to be, they seemed to dodge it with standing or rightness or mootness or something to avoid the merits. Is there anything on the merits, a merits decision from a circuit court that says that despite Runyon, those schools' policies are okay? Well, Judge Kleinfeld, we have scoured the law. And while there is no case directly on point stating that position, there's also no case, and plaintiffs have pointed to no case, in which any court has ever struck down a remedial race preference program in the educational context, none. Counsel, can I just follow up on that for a moment? You referred to this as remedial. Yes, Your Honor. My understanding that if, in the law of trust, that if Kamehameha Schools were to be very successful and achieve its goal and bring Native Americans, not Native Americans, Native Hawaiians up to a point where they were on an equal footing or in a level playing field or whatever, with everyone else in Hawaii, that this may well be struck down as a violation of public policy as an invidious discrimination. Is that your understanding as well? Your Honor, the Kamehameha Schools have twice been reassured by the IRS in explicit letters that they are not in violation of public policy, both before and after Rice for the reasons that Judge Reinhart mentioned, that it is still the congressional policy as expressed in the 2002 Native Hawaiian Education Act. For Congress to give preferences to Native Hawaiians. When the congressional public policy is to give preferences for Native Hawaiians, defined exactly as Kamehameha Schools defines Native Hawaiians, for the same remedial purposes as Kamehameha Schools gives preferences to Hawaiians, we are nowhere near the day when this preference would violate public policy. But to go back to 25 years, we've been told we're going to solve the black problem. Twenty-fourth, then. Your Honor, I'd like to Can we solve this one in 2048? Judge Reinhart, I'd like to address that point and go back to Judge Graber's remarks earlier. And I want to be very clear on what the facts in the record establish. This is a the facts in the record. Judge Kaye in the record found twice, twice, made reference twice to the finding that this is not an absolute or perpetual bar. Now, I want to be clear about this. It's not an absolute or perpetual bar in the following sense. It's not absolute in that the Kamehameha Schools does not exclude non-Native Hawaiians from all its programs. The trustees have adopted multiple strategies, some of which involve preschool programs, after-school programs, summer school programs, and significant infusions of money into independent charter schools, all of which admit non-Native Hawaiians. It is only the campus program, where there are only 5,400 places for a queue of 70,000 Native Hawaiian children aged K-12 that have had a preference that's Hawaiians first, not Hawaiians only. And as the trustees made clear from the beginning and continue to make clear today, as soon, Judge Graber, as there is a time when Native Hawaiians are not at the bottom but are at the mean of Hawaiian society, the preference policy could relax. Nevertheless, if you had a Hawaiian child whose parents, let's say, were both lawyers, just to pick something we both know, and had a very nice income, so what do we expect conventionally with that, that child would get in over a black or Filipino or Caucasian child that was disadvantaged in every way. That's correct, Your Honor, but to be clear, the remedy, as Judge Kaye found on the record below, is not just to redress socioeconomic disadvantage. It is to lift up the Hawaiian people from degradation as a group and as a culture. It is to create leaders. It's really wise to do that by separating them from all other races. I mean, I guess I have sort of bought into the melting pot diversity idea, and I'm just wondering what's so great about having a school where everybody you deal with is just like you. Your Honor, there's no question about the success of the school in producing graduates who go on to be leaders of integrated society. You're telling the University of Michigan, eh? Well, the record is replete with examples of leaders. But there's no reason to believe that that's tied to the fact that everybody is Hawaiian. I mean, they would probably be just as successful if they let in a few black students, a few Caucasian students, and so on, right? Your Honor, the evidence is clear that the public schools that finally let Hawaiians in after long dual tracking failed them, and that Kamehameha Schools has succeeded. And the evidence in the record is clear that the development of a sense of self-identity and self-worth as a culture, the release from stigmatization as a group, is an important part of that educational success. Hawaiian language was banned from the public schools from 1896 to 1986. Is there any way to avoid reaching the merits, in this case, standing, rightness, mootness? Your Honor, to return to Chief Judge Schroeder's first question and Judge Kaczynski's question earlier. I'm not kidding. I know it's funny, but Kamehameha is a wonderful school, and Runyon is the law of the United States. Kamehameha Schools is a wonderful school. It is a jewel of the Native Hawaiian people. I know that. That's why I'm asking. Is there a way to avoid reaching the merits? Your Honor, Chief Judge Schroeder and Judge Kaczynski correctly noted before that if this were tuition-free. Now, let's recall, it costs $20,000 a year to educate a Hawaiian child. Tuition is $1,700, less than a tenth of that. It's still an exchange of money for children. And 65 percent are on scholarship aid. If you were to construe this as a gift, it wouldn't 1981 would not apply. If it was just an injunction case, it would be really easy for Kamehameha Schools to give us a brand-new case by eliminating the fees, since the Bishop Estate is probably the largest charity or one of the largest charities in the world. But since there's a damages component, that isn't going to kill the case. Is there any way to avoid reaching the merits? Deciding that, well, yes, if you decide that 1981 was never intended to apply to a charitable testamentary trust, which is not a contract. That's the merits. But, Your Honor, the merits, if you reach the merits, let us be clear on how extremely narrow the principle here is. You don't want to answer me. I suppose you must be saying, no, there's no way to avoid reaching the merits. That is correct, Your Honor. Thank you. Counsel, is Kamehameha exempt from Title VII? Is it exempt from Title VII? Yes. No, it's not, Your Honor. The Title VII would be interpreted in the same way with deference to the Native Hawaiian status of the applicants. Right. Now, so if we had Kamehameha were hiring only a Native Hawaiian faculty, that would be a violation of Title VII? The standard would be the same, Judge Biby. It would be whether or not there was a reasonable relationship between that policy and a remedial purpose. There's nothing in this record about discrimination against Hawaiian teachers. There is evidence in this record about the educational deficits suffered by Hawaiian students. Okay. I want to be very clear on the return to 1981, then. Are you saying that Kamehameha is exempt from Section 1981 from an otherwise fair application of 1981 under Runyon, or are you saying that 1981 never applied in the first place? Never applied in the first place, Your Honor. We're not saying that Kamehameha Schools is exempt. It might well be exempt under Judge Fletcher's statute, which would make it explicit. But the Supreme Court has always held that Congress is not under an obligation to pass new private bills every time it wants to clarify that a general civil rights law doesn't repeal our policy. But if we were to look at Section 1981, how do we tell that 1981 doesn't apply to Kamehameha after Runyon v. McCrary? You said that it was not exempt. Now, I can look at the statutes that are at the back of the ER and look at that Native Hawaiian Education Act, and I might say, well, I think that this, what Congress is trying to do is exempt Native Hawaiians from laws of general applicability such as Section 1981. But your contention is I don't have to look at those statutes in order to figure that out. I can look purely at Section 1981 and tell that it doesn't apply to Kamehameha. We, let's remember that 1981, by its terms, never was intended to apply to remedial programs in which Caucasian challengers raise a challenge. It was designed to give to the newly freed African-American slaves the same rights as white citizens. Although that argument is largely foreclosed after Weber when the Court says what was good for African-Americans is also going to be good for whites. And after McDonald, which did the same for 1981 law. But it did so, let's be clear, in 19 — those cases came down in 1976. The Native Hawaiian preferences that Congress has continually enacted have taken place since that interpretation. Congress was aware in 1988 when it passed the Stafford-Hunkins bill that the preferences would tend to emphasize that this was an exemption from the law rather than a non-application. And once we get to 1976 and from there to McDonald and Weber, don't we have to admit that that's what Section 1981 means today? Yes, Your Honor. But we have to admit that 1981 today does allow non-minority plaintiffs to challenge race preferences where those preferences are not reasonably related to a remedial purpose. But this one is. And in looking at what 1981 means, we do submit that you must look at all the statutes that Congress enacted, both before and after Rice, giving preferences to Native Hawaiians in their role as a political class comparable to Native Americans and Alaska Natives and as an indigenous people who — of a one sovereign nation. Does Section 19 — does Section 1981 apply to — apply to Native Americans? Yes. If a Native — if a Navajo or an Alaska Native has both a racial and a political status, if Waikiki merchants were to discriminate against Native Hawaiians the way the southern States discriminated in the Black Codes, that would violate 1981. But the political classification becomes crucial to interpreting 1981 in light of Congress's intent, which is the only issue before us. It's not — you use the word exemption, which doesn't seem to me to be what we need. Your Honor, we didn't use the — I didn't use the word exemption. I believe Judge Breybe did. You agreed. I thought you did. And the reason that it doesn't seem to be what you mean is because this is a very unique circumstance. That's right. If you took — I thought you just came and turned it around and said that you had some Native American — Native Hawaiian merchants discriminating against white people, I assume you would not say they're exempt from 1981. Absolutely. We never claim that. We claim that 1981, even as interpreted to protect non-minority plaintiffs, does not bar a reasonable, private, remedial educational program for an indigenous person. And it does so for two reasons. 1981 does not bar that both for the reason that these are indigenous people, and so the deference to all the surrounding statutes that on either side of Rice v. Cayetano say that Native Hawaiians have a special status. Because that calls for special latitude for private entities that enact the same kind of preferences for indigenous Hawaiians, and also because, as the exchange with Judge O'Scallan made clear, when a program really is remedial for past harm, and you have bona fide evidence that it's continually remedial for that past harm, had George Washington Carver turned the peanut and sweet potato money into a comparable institution for the descendants of newly freed slaves, 1981 would not bar that kind of private — Counsel. I'm sorry, Your Honor. The time has expired. Thank you, Your Honor. So we respectfully request that you affirm the district court. Thank you. Mr. Kleinfeld, I'll answer your question. There is no way to avoid reaching the merits. What about the testamentary trust in the following sense? As I understand it, the applicant is, if he were accepted, would pay a small amount of money that would be subsidized by the trust to the tune of $18,000 or so. What would happen if he were to pay the entire amount of money is one question, but that isn't what's going on here. He's applying for a subsidy of $18,000. Is that correct? I don't know how much the subsidy is, Your Honor. A large subsidy. There may be a subsidy, certainly. Therefore, what he's asking for, in addition to the right to make a contract, is the ability to get a large subsidy from this trust. Your Honor, the question is whether this is the making and enforcement of a contract within the meaning of the statute. I think that is the question. And Kamehameha never disputed that in the district court. And, in fact, the district court found that Section 1981 applies in that sense. And the parties disputed only the question whether there was a legitimate justification for the admitted racial discrimination in the making and enforcement of this educational contract as there was in Runyon. Now, I thought we were ---- You're giving Judge Berzon a good reason not to answer her question. Nevertheless, I would like to hear the answer to her question, even though you now have a good reason for not answering it. I'm sorry, Your Honor. You explained to Judge Berzon why her question is no good, because this was conceded, it's not before us, and so on. Nevertheless, I'd like to know the answer to her question. This is like Runyon. Well, it's not. Runyon was a commercial enterprise. They were making money on the school. What's going on here, the net effect of this transaction, if you get into the school, is they give you money. I mean, sure, you pay something. But the net effect is that you're going to get heavily subsidized. So it's really not a commercial contract. And why does 1981 apply at all to a situation where what you're basically applying for is to get a gift? If you get in, you get a big subsidy. Your Honor, and if I sound like a broken record, I apologize. I believe this case is analogous to Runyon in Patterson v. McLean Credit Union. That was a commercial enterprise, too. Maybe you don't have an answer. I mean, that's perfectly okay if you don't have an answer. Then you don't give it. The question is, why would some line of cases that applies to commercial enterprises, a very clear line about the commercial enterprises, why should they apply? Do they apply to situations where it's not a commercial enterprise? What you've got is basically a big money giveaway. Please answer that very briefly. Your Honor, because this is a contract. And this is like the contract in Runyon. And the Court said in Patterson that Runyon remained good law. And, in fact, in the Civil Rights Act of 1991, Congress expanded the coverage of Section 1981. Thank you. That will have to do it, Your Honor. The case just argued is submitted to decision. That concludes the Court's calendar for this morning. The Court stands adjourned.
judges: Schroeder, Pregerson, Reinhardt, Kozinski, O'scannlain, Rymer, Kleinfeld, Graber, W Fletcher, Paez, Berzon, Tallman, Rawlinson, Bybee, Callahan